UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ORLIS XAVIER ORELLANA JOYA | CIVIL ACTION |
| VERSUS | NO. 20-236 |
| NORMA ARELY MUNGUIA GONZALES | SECTION M (5) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves a petition brought under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"). Petitioner Orlis Xavier Orellana Joya ("Orellana") is the father of a five-year-old boy known as S.O.O.M.[1] Orellana petitions this Court to return S.O.O.M. to Honduras, asserting that in May 2019, respondent Norma Arely Munguia Gonzales ("Munguia"), S.O.O.M.'s mother, wrongfully brought S.O.O.M. to the United States, where he remains.[2]

This matter was tried before the Court, sitting without a jury, on February 27, 2020. Having considered the evidence admitted at trial, counsel's arguments, the parties' post-hearing memoranda,[3] the record, and the applicable law, the Court hereby issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any finding of fact may be construed as a conclusion of law, the Court adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

---

[1] Pursuant to Rule 5.2 of the Federal Rules of Civil Procedure, the name of the child has been redacted and his initials ("S.O.O.M.") are used in lieu of his full name.
[2] R. Doc. 1.
[3] R. Docs. 19 & 21.

## I. JURISDICTION & VENUE

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Convention and this country's implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001, *et seq*. Venue is proper because S.O.O.M. was located within this district when Orellana filed the petition. 22 U.S.C. § 9003(b) (a court "is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed").

## II. PROCEDURAL HISTORY

On May 14, 2019, Orellana applied to the Honduran central authority under the Convention, the Instituto Hondureño de la Ninez y la Familia ("IHNFA") (the Honduran Directorate for Children, Youth, and Family), for S.O.O.M.'s return to Honduras from the United States.[4] IHNFA transmitted Orellena's application to the United States Department of State ("State Department"), and in June 2019, the State Department located Munguia and S.O.O.M. in New Orleans, Louisiana.[5] On June 5, 2019, the State Department notified Munguia of Orellena's application, and she responded that she is not willing to return S.O.O.M. to Honduras voluntarily.[6]

On January 22, 2020, Orellana filed his petition in this Court seeking S.O.O.M.'s return to Honduras under the Convention and ICARA. The next day, this Court set an in-person status conference to be held before the magistrate judge on January 29, 2020, to determine if Munguia qualified to receive the services of court-appointed counsel, and ordered Munguia to appear at the status conference.[7] This Court also ordered that S.O.O.M. remain within the district until an adjudication of the merits of Orellana's petition, set a bench trial for February 10, 2020, and

---

[4] R. Doc. 1-3.
[5] *Id.*
[6] *Id.*
[7] R. Doc. 4.

ordered that any opposition to the petition and proposed findings of fact and conclusions of law be filed no later than February 5, 2020.[8]

Munguia was served with the petition on January 25, 2020,[9] but she failed to appear at the January 29, 2020 status conference.[10] As a result, the magistrate judge conditionally appointed counsel to represent Munguia, and ordered that the attorney make his best efforts to contact her, explain the proceedings to her, and arrange for her appearance at an appointment-of-counsel hearing on February 4, 2020.[11] Because the conditionally-appointed counsel informed the magistrate judge that Munguia refused his services, the magistrate judge cancelled the February 4, 2020 hearing and vacated the conditional appointment.[12]

On February 4, 2020, this Court continued the February 10, 2020 trial to February 27, 2020, because the respondent's answer was not due until February 18, 2020.[13] The Court also re-issued its order that S.O.O.M. not leave the district until an adjudication of the merits of Orellana's petition, and ordered Munguia to appear with S.O.O.M. at the February 27, 2020 trial.[14] Further, the Court ordered that any opposition to the petition and proposed findings of fact and conclusions of law be filed no later than February 21, 2020.[15]

Munguia was served with the aforementioned order on February 4, 2020.[16] However, she did not file an answer by the February 18, 2020 deadline or proposed findings of fact and

---

[8] *Id.*
[9] R. Doc. 5.
[10] R. Doc. 6.
[11] *Id.*
[12] R. Doc. 8.
[13] R. Doc. 7.
[14] *Id.*
[15] *Id.*
[16] R. Doc. 11.

3

conclusions of law by the February 21, 2020 deadline.[17] As a result, on February 20, 2020, the Court granted Orellana's motion for entry of default against Munguia.[18]

The Court held the trial on the petition on February 27, 2020.[19] Orellana appeared via live video feed from Honduras, and his counsel were present in court.[20] Munguia and S.O.O.M. appeared in person with an attorney who had not yet enrolled in the case.[21] The Court granted the attorney's oral motion to enroll.[22] The Court heard testimony from Orellana and Munguia, along with arguments of counsel.[23] At the close of the hearing, the Court ordered post-trial memoranda to be filed no later than March 9, 2020, and reiterated that S.O.O.M. was not to leave the district until a determination on the merits was completed.[24] On March 9, 2020, the parties filed their respective post-trial memoranda.[25]

## III. FINDINGS OF FACT

Orellana, a citizen of Honduras, is 24 years old and currently lives with his mother and brother in Comayagua, Honduras.[26] He works full-time as a barber and attends night school where he studies systems engineering.[27]

Munguia is also a citizen of Honduras.[28] Orellana and Munguia met at school and became friends.[29] They were involved in a romantic relationship together from 2011 to 2017, but were

---

[17] Nor did Orellana timely file proposed findings of fact and conclusions of law. However, on February 26, 2020, he sought, and was granted, leave of court to do so. R. Docs. 14-16.
[18] R. Docs. 12 & 13. Because Orellana has not moved to confirm the default, and this Court held an evidentiary hearing, the Court will decide this matter on the merits.
[19] R. Doc. 17.
[20] *Id.*
[21] *Id.* Considering his young age, the parties agreed that S.O.O.M. should not be present in the courtroom during the proceedings. Thus, S.O.O.M. waited with a Spanish-speaking adult in the jury room.
[22] *Id.* As directed, Munguia's counsel confirmed his oral motion with a written motion to enroll. R. Doc. 20.
[23] R. Doc. 17.
[24] *Id.*
[25] R. Docs. 19 & 21.
[26] Testimony of Orellana.
[27] *Id.*
[28] Testimony of Munguia.
[29] Testimony of Orellana.

never married.³⁰  Their son, S.O.O.M., was born in Comayagua, Honduras on May 17, 2014.³¹ Although Munguia testified that she and Orellana sometimes had heated arguments, the relationship has no history of domestic violence, and Orellana has never physically assaulted either Munguia or S.O.O.M.³²

After their romantic relationship ended, Orellana and Munguia amicably shared custody of S.O.O.M. pursuant to an oral agreement.³³  Neither party ever obtained a formal custody declaration from a Honduran court.³⁴  Orellana picked S.O.O.M. up from school every day, and kept him until Munguia got off of work, at which time she would pick S.O.O.M. up from Orellana at his mother's house.³⁵  S.O.O.M. spent weekends primarily with Munguia, but Orellana had access to S.O.O.M. on the weekends for special occasions.³⁶  Both parents provided financial support for S.O.O.M.'s care.³⁷

On May 6, 2019, Orellena granted Munguia's request to take S.O.O.M. with her to job training in San Pedro, Honduras, over Mother's Day weekend, with the expectation that S.O.O.M. would be returned to Orellana on May 12, 2019.³⁸  Instead of returning S.O.O.M. to Orellana, Munguia took S.O.O.M. to the United States without Orellana's knowledge or consent, leaving a voicemail for Orellena's mother stating that she was moving to the United States with S.O.O.M.³⁹ On May 13, 2019, Orellena contacted the police, who referred him to the IHNFA.⁴⁰  Thereafter, Orellena filed an application with IHNFA for S.O.O.M.'s return to Honduras.  S.O.O.M. lived his

---

³⁰ *Id.*
³¹ *Id.*  Thus, S.O.O.M. too is a citizen of Honduras.
³² Testimony of Orellana & Munguia.
³³ *Id.*
³⁴ Testimony of Orellana.
³⁵ Testimony of Orellana & Munguia.
³⁶ *Id.*
³⁷ *Id.*
³⁸ Testimony of Orellana.
³⁹ *Id.*
⁴⁰ *Id.*

entire life in Honduras until Munguia removed him to the United States, and Orellana never gave Munguia permission to do so.[41] Orellana has not spoken directly with Munguia and, until trial, has had only one conversation with S.O.O.M. since they left Honduras[42]

## IV. CONCLUSIONS OF LAW

### A. The Convention and ICARA

The Convention, which was adopted in 1980 in response to the problem of international child abduction during domestic disputes, seeks "to secure the prompt return of children wrongfully removed or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Convention, art. 1). The Convention seeks to "discourage forum shopping in international child-custody disputes when it takes the form of removing a child to the jurisdiction preferred by one of the parents." *Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006) (citations omitted).

The purpose of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (quoting Convention, pmbl.). Essentially, the goal is to "'restore the pre-abduction status quo.'" *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) (*Friedrich II*)). The Fifth Circuit has recognized that the Convention's Explanatory Report is "the official history, commentary, and source of background on the meaning of the provisions of the Convention." *Id.* at 343; Elisa Pérez-Vera, Explanatory Report, *in* 3 Hague Conference on Private

---

[41] *Id.*
[42] *Id.*

International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426-76 (1982) ("Explanatory Report"). The Explanatory Report states:

> [F]rom the Convention's standpoint, the removal of a child by one [parent with custody] without the consent of the other, is ... wrongful, and this wrongfulness derives ... from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. ... *[The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future. ... It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.*

*Id.* at 344 (alterations and emphasis in original) (quoting Explanatory Report, ¶71, at 447-48). Under the Convention, courts in countries other than that of the child's habitual residence are prohibited from adjudicating the merits of the underlying custody dispute. *Id.*; *see also* 22 U.S.C. § 9001(b)(4); Convention, art. 19.

The Convention applies to any child under the age of 16 who was a habitual resident in a contracting state immediately before any breach of custody rights. Convention, art. 4. Article 12 of the Convention provides that a court "shall order the return of the child forthwith" if the child has been wrongfully removed or retained under the terms of the Convention, and less than one year has elapsed between the date of the wrongful removal or retention and the date of the filing of the petition. *Id.* art. 12. However, if more than one year has elapsed between the date of the wrongful removal or retention and the date of the filing of the petition, the court "shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." *Id.*

In 1988, the United States ratified the Convention and passed ICARA, the implementing legislation in the United States. *See* 22 U.S.C. §§ 9001, *et seq.* The treaty was ratified between the United States and Honduras on June 1, 1994. *See* U.S. Hague Convention Treaty Partners, https://travel.state.gov/content/travel/en/International-Parental-Child-bduction/abductions/hague-

abduction-country-list.html (last visited on March 10, 2020). ICARA's provisions "are in addition to and not in lieu of the provisions of the Convention." 22 U.S.C. § 9001(b)(2).

Under ICARA, a person seeking the return of a child allegedly wrongfully removed to or retained in the United States may file a civil action in either a state or federal district court in the place where the child is located at the time the petition is filed. *Id.* § 9003(a)-(b). A court decides an ICARA "case in accordance with the Convention." *Id.* § 9003(d). ICARA specifies the petitioner's and the respondent's respective burdens of proof. *Id.* § 9003(e). The petitioner must "establish by a preponderance of the evidence … that the child has been wrongfully removed or retained within the meaning of the Convention." *Id.* § 9003(e)(1)(A). On the other hand, "a respondent who opposes the return of the child has the burden of establishing (A) by clear and convincing evidence that one of the exceptions set forth in article 13b [*i.e.*, grave risk of harm] or 20 [*i.e.*, protection of human rights and fundamental freedoms] of the Convention applies; and (B) by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies." *Id.* § 9003(e)(2).

### 1. Petitioner's *Prima Facie* Case of Wrongful Removal

Article 3 of the Convention provides:

The removal or the retention of a child is to be considered wrongful where –

*a*) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

*b*) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3. Thus, to show wrongful removal or retention, the petitioner must establish three elements by a preponderance of the evidence: (1) "that the respondent removed or retained the child somewhere other than the child's habitual residence"; (2) "whether the removal or

8

retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws"; and (3) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012) (citations and quotations omitted); *see also* 22 U.S.C. § 9003(e)(1)(A).

### a. Removal of the Child to Somewhere Other than Habitual Residence

The Convention does not define "habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020). "A child 'resides' where [he] lives" and his "residence in a particular country can be deemed 'habitual,' however, only when [his] residence there is more than transitory." *Id.* (citation omitted). Indeed, "'[h]abitual' implies customary, usual, of the nature of a habit." *Id.* (quoting BLACK'S LAW DICTIONARY 640 (1979)). The Supreme Court has held that "[t]he place where the child is at home, at the time or removal or retention, ranks as the child's habitual residence," and determining that location is a fact-driven inquiry dependent upon "the unique circumstances of the case and informed by common sense." *Id.* at 726-27 (citations and quotations omitted). "No single fact … is dispositive across all cases." *Id.* at 727. But, "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with [his] family indefinitely, that place is likely to be [his] habitual residence." *Id.* The goal of determining the child's habitual residence is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum – the country where the child is at home." *Id.*

This is a case where determining the child's habitual residence is straightforward. There is no dispute that Honduras is S.O.O.M.'s country of habitual residence. S.O.O.M. was born in Honduras and resided there in the custody of both parents until Munguia brought him to the United States in May 2019, without Orellana's consent. Therefore, Munguia removed S.O.O.M. to the

9

United States – somewhere other than his habitual residence, Honduras, the country where he is at home.

### b. Removal Violated Petitioner's Rights of Custody

"[R]ights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a). "These rights need not be enshrined in a formal custody order issued before the removal or retention; the Convention also recognizes rights of custody that arise '*ex lege*.'" *Larbie*, 690 F.3d at 307 (citations omitted). Indeed, the Convention provides that "rights of custody ... may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of" the child's nation of habitual residence. Convention, art. 3.

The parties do not have a court-ordered custody arrangement for S.O.O.M.[43] In the absence of such an order, Honduran family law provides that parental rights are governed by the principles of *patria potestas*. *See* Honduran Family Code, tit. V (custody), ch. 1 (general provisions). The following provisions of the Honduran family code address parental rights concerning custody:

> ARTICLE 185
>
> *Patria potestas [parental authority]* is a set of rights and duties held by parents over the person and property of their children. It is governed by the legal regime for the protection of minors, in order to prevent abuse and to sanction the father or mother with the loss or suspension of said authority in such cases as provided under this Act.
>
> ARTICLE 186
>
> *Patria potestas* includes, amongst other rights and obligations, that of being the legal representative of the minor child; that of carrying out his or her care and custody; that of feeding, helping, educating and managing his or her property.

---

[43] Testimony of Orellana & Munguia.

ARTICLE 187

> The exercise of *Patria potestas* corresponds to both parents jointly. However, one of them may alone exercise it when it is conferred upon him or her by judicial decision, or if the other parent were unable to exercise it. In these cases, the domicile of the minor child shall be that of the parent who exercises *Patria potestas*. Should there be a disagreement between the father and the mother regarding the exercise of *Patria potestas*, the competent court shall decide, based on the minor child's best interests. …

*Medina v. Pallett*, 2010 BCSC 259, 2010 CarswellBC 449 (Can.) (translating Honduran law in a case brought under the Convention).[44] And the following provision of the Honduran code on childhood and adolescence addresses the authorization of a child to travel:

ARTICLE 101

> Children may only leave the country if they are accompanied by their father, their mother or their legal representative, or, should none of these persons be available, by the person who holds the pertinent written authorization.
>
> If *Patria potestas* is exercised by both parents and only one parent is accompanying the child on a trip, the other parent's written authorization is required.
>
> Signatures must be authenticated by a Notary.

*Id.*[45]

Under the applicable Honduran law of *patria potestas*, then, both parents have joint custody of the child unless (1) there is a court order specifying otherwise, or (2) one of the parents is unable to exercise his or her rights of custody. There is no evidence here that either parent was "unable" to exercise his or her custody rights. Indeed, both Orellana and Munguia testified that they had an oral agreement to share custody of S.O.O.M., who spent significant time with both parents every week.[46] Orellana did not give his written, notarized permission for Munguia to take S.O.O.M. out of Honduras, and there is no evidence of a court order changing the shared custody arrangement

---

[44] *See* R. Docs. 1-4 at 1-3; 1-5 at 1-2.
[45] *See also* R. Doc. 1-5 at 1.
[46] Testimony of Orellana & Munguia.

in this case. Therefore, Munguia's removal of S.O.O.M. from Honduras to the United States, without Orellana's permission, violated Orellana's custody rights.

### c. Actual Exercise of Custody Rights at the Time of Removal

The Fifth Circuit has stated that it is "relatively easy" for a petitioner to demonstrate that he actually exercised his custody rights at the time or removal, *Larbie*, 690 F.3d at 307, because courts are to construe the term "exercise" broadly to avoid crossing "the line into a consideration of the underlying custody dispute." *Sealed Appellant*, 394 F.3d at 344. Thus, when there is no custody ruling from the country of the child's habitual residence, American courts "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id.* at 344-45 (quoting *Friedrich II*, 78 F.3d at 1065).

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child.* Once it determines that the parent exercised custody rights in any manner, the court should stop – completely avoiding the question of whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of federal courts.

*Id.* at 345 (quoting *Friedrich II*, 78 F.3d at 1066) (emphasis in *Sealed Appellant*). Thus, even occasional contact with the child constitutes "exercise" of custody rights, and the removing parent must show that the other parent has abandoned the child to demonstrate a failure to exercise custody rights. *Id.*; *see also Larbie*, 690 F.3d at 307.

Orellana exercised his custody rights and cared for S.O.O.M. from the time of S.O.O.M.'s birth.[47] Under the parents' oral custody arrangement, Orellana sees S.O.O.M. every weekday when he picks the child up from school, and sometimes sees him on the weekends.[48] This is

---

[47] *Id.*
[48] *Id.*

12

enough to establish the exercise of custody rights under the applicable law. Further, Orellana provided at least some financial support for S.O.O.M.'s care.[49] There is no evidence that Orellana ever neglected his relationship with S.O.O.M. when the child was in Honduras. Munguia's argument that Orellana now fails to exercise his custody rights because he has not visited the United States to see S.O.O.M.[50] is of no avail because it is the pre-abduction exercise of custody rights that is considered. It would be ironic indeed – and contrary to Convention aims – if a parent removing a child to a distant country could use the obstacles he or she has created by the removal as evidence of the other parent's failure to exercise custodial rights. Therefore, Orellana has demonstrated that he was actually exercising his custodial rights over S.O.O.M. at the time of the removal.

## 2. Affirmative Defenses

Articles 12, 13 and 20 of the Convention provide affirmative defenses (exceptions) to a respondent who opposes the child's return. A court is not bound to order the child's return if the respondent proves by a preponderance of the evidence that: (1) more than a year passed from the time the child was wrongfully removed or retained and the child is now settled in the new environment;[51] (2) the petitioner was not actually exercising custody rights at the time of the removal or retention or had consented to or subsequently acquiesced in the removal or retention;[52] or (3) the child objects to being returned and has attained an age and degree of maturity at which

---

[49] *Id.*
[50] R. Doc. 19 at 2.
[51] Munguia did not raise this affirmative defense. Regardless, the "well-settled child" defense is not available to her because the petition was filed less than a year after the wrongful removal.
[52] Munguia also did not assert this affirmative defense, but it too is not available to her. The Court has already found that Orellana was exercising his custody rights with respect to S.O.O.M. at the time of the removal, and that Orellana did not consent to the removal.

it is appropriate to take the child's views into account.[53] *See* Convention, arts. 12 & 13; 22 U.S.C. § 9003(e)(2)(B). Further, a court is not bound to order the child's return if the respondent proves by clear and convincing evidence that: (1) there is grave risk that return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation; or (2) principles of the country where the child is located post-abduction relating to the protection of human rights and fundamental freedoms do not permit return of the child.[54] Convention, arts. 13(b) & 20; 22 U.S.C. § 9003(e)(2)(A).

All of the affirmative defenses under the Convention are "narrow," 22 U.S.C. § 9001(a)(4), and "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich II*, 78 F.3d at 1067. Indeed, "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.* (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)).

### a. Waiver of affirmative defenses

Orellana argues that Munguia waived any affirmative defenses by failing to timely file an answer to the petition. He has good grounds to think so. *See* Fed. R. Civ. P. 8(c); *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) ("[A] defendant should not be permitted to 'lie behind a log and ambush a plaintiff with an unexpected defense.'"); *Alanis v. Reyes*, 230 F. Supp. 3d 535, 545 (N.D. Miss. 2017) (acknowledging respondent's waiver of affirmative defenses by his failure to file responsive pleading, but nevertheless addressing substance of defenses). "A technical failure to plead an affirmative defense in compliance with Federal Rule of Civil Procedure 8(c),

---

[53] Munguia does not raise this affirmative defense either, and there is no indication that five-year-old S.O.O.M. has reached a level of maturity as would make it appropriate to consider his views, which were not presented to the Court in any event.

[54] Nor does Munguia this defense, and there is no evidence to support its application.

14

however, does not fatally destroy a proponent's ability to raise the affirmative defense if it is raised in the trial court in a way that does not result in unfair surprise." *Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 923 (W.D. Tex. 2012) (holding that in the context of a Convention case a respondent does not necessarily waive an affirmative defense even when not pleaded if it is raised at a pragmatically sufficient time so as not to prejudice a petitioner) (citing *Rogers v. McDorman*, 521 F.3d 381, 385-86 (5th Cir. 2008)); *see Fuentes-Rangel v. Woodman*, 2014 WL 11456066, at *2 (N.D. Ga. May 27, 2014) (considering affirmative defense to ICARA petition where petitioner's filing anticipated defense ahead of trial). While there may be some question whether Munguia's affirmative defense was "raised at a pragmatically sufficient time, and [whether Orellana] was not prejudiced in [his] ability to respond," *Bernal*, 923 F. Supp. 2d at 923 (quoting *Rogers*), Orellana did anticipate Munguia's assertion of her affirmative defense ahead of trial, having addressed it and several others in his pre-hearing filing.[55] Regardless, because the Court finds that Munguia has not carried her burden of persuasion on the lone defense she does raise in her post-hearing memorandum (the grave-risk defense), the Court need not determine whether she waived this defense. *See Nunez Bardales v. Lamothe*, 2019 WL 5555540, at *8 (M.D. Tenn. Oct. 25, 2019) (burden not met on affirmative defense even if respondent did not waive it by failing to raise it in her pleadings).

### b. Grave risk of harm

Munguia asserts only the affirmative defense of grave risk to the child, claiming that Orellana "engages in anti-government opposition groups hostile to the Honduran government and that [he] was indoctrinating the child in these groups, which will subject the child to hostilities if the child were returned to Honduras," and that his return would be disruptive because Munguia was "his primary care giver and provider all of his life."[56]

---

[55] *See* R. Doc. 16 at 7-10.
[56] R. Doc. 19 at 3-4.

15

Under article 13 of the Convention, a court may, in its discretion, decline to return a child to his country of habitual residence if the respondent proves by clear and convincing evidence that there is a grave risk that the child's return would expose him to physical or psychological harm or otherwise place the child in an intolerable situation. *Soto v. Contreras*, 880 F.3d 706, 710-11 (5th Cir. 2018). The level of harm required for the application of this exception is "a great deal more than minimal." *Sanchez v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)). "The potential harm 'must be severe,' and there must be a 'probability that the harm will materialize.'" *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014) (quoting *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013)). "The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (citing *Friedrich II*, 78 F.3d at 1064).

To satisfy this exception, the respondent must present more than evidence that the child has settled into his new home and he would have adjustment issues by being returned. *See England v. England*, 234 F.3d 268, 270-71 (5th Cir. 2000). Further, the grave-risk exception does not prevent "return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State." *Charalambous v. Charalambous,* 627 F.3d 462, 468 (1st Cir. 2010) (quoting *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001)).

Rather, a child is considered at grave risk if he would be sent to a zone of war, famine, or disease, or would face serious abuse or neglect. *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011). Domestic violence can present a grave risk "when the respondent shows by clear and convincing evidence a 'sustained pattern of physical abuse and/or a propensity for violent abuse.'" *Ermini*, 758 F.3d at 164 (quoting *Souratgar*, 720 F.3d at 104). "'[G]rave risk' of harm from abuse [is] established where the 'petitioning parent had actually abused, threatened to abuse, or inspired

fear in the [child] in question.'" *Id.* (quoting *Souratgar*, 720 F.3d at 105). However, "sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id.* at 165 (quoting *Souratgar*, 720 F.3d at 104) (brackets omitted).

Munguia has not proved by clear and convincing evidence that returning S.O.O.M. to Honduras would place him at grave risk of physical or psychological harm. Munguia and Orellana both testified that Orellana has never physically or mentally harmed S.O.O.M.[57] Munguia testified that Orellana abused her "psychologically and emotionally," but then described verbal altercations (raised voices and unkind words) that are not uncommon to many familial relationships, and certainly did not raise the specter of severe abuse.[58] Moreover, there is no indication in the record that these altercations involved S.O.O.M., much less involved abuse of him.

Munguia testified that the grave risk of harm to S.O.O.M. arises from Orellana's supposed association with various unspecified anti-government groups.[59] Munguia claims that S.O.O.M. is at risk because the unspecified groups are involved in drugs and violence, and Orellana taught S.O.O.M. some of the groups' chants and songs in an effort to influence him.[60] As an example of the groups' violence, Munguia testified that she was twice robbed by members of such groups.[61] Munguia also argues that she is S.O.O.M.'s primary caregiver and it would disrupt his life to send him back to Honduras.[62]

Munguia offered no evidence to corroborate her testimony of Orellana's involvement in anti-government groups or the supposed danger that they pose. She did not name the groups or

---

[57] Testimony of Orellana & Munguia.
[58] Testimony of Munguia.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] R. Doc. 19 at 3-4.

17

describe their activities except in the vaguest of terms. Orellana denied participating in such groups.[63] Moreover, Munguia denied that the robberies she experienced were due to Orellana's participation in the groups, and she testified that neither she nor S.O.O.M. has ever been harmed or threatened by any members of the groups.[64] The minimal, amorphous, and uncorroborated evidence offered by Munguia – just her self-serving testimony – does not approach the clear-and-convincing threshold required to prevent S.O.O.M.'s return to Honduras on the basis of the grave-risk exception. Further, the case law establishes that any supposed disruption in S.O.O.M.'s life posed by his return is not proof of a grave risk of harm. Hence, Munguia's affirmative defense fails.

3. **Fees and Costs**

Orellena seeks costs and attorney's fees.[65] ICARA states that when a court orders that the child be returned to the petitioner, the court "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007(b)(3). The respondent bears the burden of showing that an award of legal fees, expenses, and costs would be "clearly inappropriate." *Soonhee Kim v. Ferdinand*, 287 F. Supp. 3d 607, 631 (E.D. La. 2018). Because this Court has determined that S.O.O.M. must be returned to Honduras and grants Orellana's petition, Orellana is entitled to recover attorney's fees, expenses, and costs, unless Munguia proves that it would be "clearly inappropriate."

---

[63] Testimony of Orellana.
[64] Testimony of Munguia.
[65] R. Doc. 21 at 9.

The amount of the award remains to be determined. Munguia insists that no award is appropriate because she "earns only a modest living," she has provided all financial support for S.O.O.M. since May 2019, and "[t]here has been no showing of a dogged refusal to give up custody or litigation tactics intended to manipulate judicial process for the purpose of delay on [her] part."[66] These factors will be weighed by the Court in fixing the amount of the award.

## V. CONCLUSION

The Supreme Court has instructed that "[w]hen a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott*, 560 U.S. at 9 (citing Convention, arts. 4 & 12). No exceptions apply here. Accordingly, for the foregoing reasons,

IT IS ORDERED that Orellana's petition for S.O.O.M.'s return to Honduras is GRANTED, and S.O.O.M shall be returned to Honduras within thirty (30) days of the date of this order. The parties are advised that this deadline will not be extended without mutual agreement.

IT IS FURTHER ORDERED that the parties shall promptly and diligently coordinate, in good faith, S.O.O.M.'s return to Honduras. Within ten (10) days of the date of this order or two (2) days prior to S.O.O.M.'s planned return, whichever is earlier, the parties shall file a joint report informing the Court of the exact method and timing of S.O.O.M.'s planned transport to Honduras. As soon as possible, and not later than three (3) days after S.O.O.M's return to Honduras, the parties will file a notice with the Court advising that S.O.O.M. has been safely returned to Honduras. This Court's order is in no way intended to adjudicate the merits of any underlying custody dispute, which, under the Convention, is best left to the Honduran judicial system. However, this Court will retain jurisdiction over this matter until S.O.O.M is returned to Honduras.

---

[66] R. Doc. 19 at 4-5.

IT IS FURTHER ORDERED that Munguia, or any person acting in concert with or participating with her, is prohibited from taking any action to remove S.O.O.M. outside of the Eastern District of Louisiana, except to effectuate his return to Honduras. If Munguia, or anyone acting on her behalf, does remove S.O.O.M. from this district, other than for the purpose of returning him directly to Honduras, severe sanctions shall be imposed, including possible arrest and incarceration for contempt of court. The parties are advised that the Court will direct the United States Marshal Service to take physical custody of S.O.O.M. if the Court believes that such action is necessary.

IT IS FURTHER ORDERED that Munguia pay Orellana's necessary attorney's fees, expenses, and costs pursuant to 22 U.S.C. § 9007(b)(3). The award of fees, expenses, and costs under § 9007(b)(3) is contingent upon Orellana's filing, within twenty-one (21) days of the date of this order, an itemization of all fees, expenses, and costs requested and a memorandum detailing the services rendered. Fed. R. Civ. P. 54(d)(2)(B)(i). Munguia shall have seven (7) days from the date of service of Orellana's itemization and memorandum to file a response asserting why she believes the requested award is "clearly inappropriate" under § 9007(b)(3). In particular, Munguia shall state her income, any financial assets, necessary expenses, and her out-of-pocket litigation fees and costs associated with this lawsuit. Afterward, Orellana may file a reply memorandum to Munguia's response within five (5) days from the date of service of Munguia's memorandum. The Court will then determine the appropriate monetary award of attorney's fees, expenses, and costs.

New Orleans, Louisiana, this 12th day of March 2020.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE